UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────────

DEBORAH L. KELLER,

                          Plaintiff,

           -vs-                                    02-CV-0719C(F)

GREAT LAKES COLLECTION BUREAU, INC., et al.,

                          Defendants.

─────────────────────────────────────


APPEARANCES:          MORIARTY & DEE (ROBERT B. MORIARTY, ESQ.), Buffalo,
                      New York, for Plaintiff.

                      BOND, SCHOENECK & KING, PLLC (JAMES J. ROONEY,
                      ESQ.), Buffalo, New York, for Defendant.


## <u>INTRODUCTION</u>

        Plaintiff brought this employment discrimination case on October 9, 2002 against

her former employer and its parent company alleging causes of action pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and common law claims for

breach of contract and fraudulent misrepresentation[1] (Item 1).  In an amended complaint

filed February 12, 2003, plaintiff deleted NCO Group, Inc. as a defendant (Item 14).

Defendant filed an answer to the amended complaint on March 10, 2003 (Item 15).

        Following unsuccessful settlement negotiations, defendant filed this motion for

summary judgment on August 31, 2004 (Item 29).  Plaintiff filed a response to the motion

───────────────────

        [1] In her response to the motion, plaintiff concedes that the fraudulent representation claim should
be dismissed (Item 35, p. 19).

on October 29, 2004 (Items 35, 36).   On November 11, 2004, defendant filed a supplemental affirmation (Item 37), a supplemental declaration (Item 38), and a reply memorandum (Item 39).  The court deemed oral argument unnecessary.  For the reasons that follow, the motion for summary judgment is granted, and the complaint is dismissed.

## **FACTS**[2]

Plaintiff began her employment with defendant in November 1989 and was assigned to the payroll and accounting department.  Deposition of Deborah Keller ("Keller Dep."), Exhibit A to Items 31 and 36, pp. 45, 47, 60.  Her duties also involved accounts payable, payroll, and account reconciliation.  *Id.,* pp. 47-49.  In March 1990, plaintiff was given the title "Assistant Controller."  *Id.,* p. 47.

Plaintiff took a twelve-week maternity leave in May 1997.  Keller Dep., p. 64.  She returned to work and experienced no retaliation as a result of taking the leave or having the baby.  *Id.,* p. 65.  In August 1997, defendant was purchased by GE Capital.  *Id.,* p. 58.  In March or April 1998, the decision was made to reorganize the office and split the accounting and payroll departments.  *Id.,* pp. 66-67.  Plaintiff was assigned to the accounting and finance department in July 1988.  *Id.,* pp. 76-78.  Her duties were to include bank reconciliations, supervision of accounts payable, general ledger schedules, maintaining petty cash, M&T banking, and accounting for North American Capital Corporation, an affiliated company.  *Id.,* pp. 86-87.

---

[2]  This factual statement is taken from the papers in support of and in opposition to the defendant's motion for summary judgment, primarily plaintiff's deposition, Exhibit A to Docket Items 31 and 36.

In approximately October 1998, plaintiff announced her second pregnancy. Keller Dep., p. 109. Her supervisor, Jerry Richter, was concerned about who would perform plaintiff's duties during her maternity leave. Keller Dep., p. 110. Plaintiff received her first negative performance review in March 1999 based on her 1998 work. *Id.,* p. 123. In the review, plaintiff's supervisors stated that her "job responsibilities have dramatically changed . . .[and] [m]ore is expected from the position of assistant controller." (Item 31, Exh. D; Item 36, Exh. C). Plaintiff was shocked and upset with the review, because she felt she was very productive in 1998, training new employees and undertaking new duties. Keller Dep., p. 125. Richter and Richard Surber, the CFO of the company at the time, suggested that plaintiff improve her general accounting skills, although she was told that the training could wait until the conclusion of her maternity leave. *Id.,* pp. 127, 140. Sometime in 1999, Surber asked plaintiff whether her family was more important to her than her career. *Id.,* p. 133. When plaintiff reported this to Richter, he also asked plaintiff about her commitment to her career. *Id.,* p. 134. On one occasion in 1999 when plaintiff left work to pick up her children from day care, Richter asked why plaintiff's husband, who typically picked up the children, could not do so. *Id.,* pp. 135-36, 150.

Plaintiff's second child was born in June 1999, and she took another twelve-week maternity leave. Keller Dep., pp. 109 -10. Upon her return in September 1999, plaintiff did nothing on her own to develop her accounting skills during the remainder of the year. *Id.,* p. 175. Her new duties were time-consuming, and she expected that the accounting training would be provided by Richter. *Id.,* pp. 176, 190.

Plaintiff's performance review in 2000 for work done in 1999 was also negative for plaintiff's lack of accounting knowledge and skills (Item 31, Exh. F; Item 36, Exh. D).   In 2001, plaintiff received another negative review, and was placed on a "Performance Development Plan" (Item 31, Exhs. E, F).   It was suggested that plaintiff take college accounting courses, yet she already had a four-year degree and was not interested in earning an accounting degree.   Keller Dep., p. 211.   She was also concerned that she would not qualify for tuition reimbursement because of the negative performance reviews. *Id.,* p. 212.   Plaintiff tried, but was unable to find an accounting seminar to attend at a local college.   *Id.,* p. 213.

In March 2000, plaintiff's older son was asked to leave his day care provider. Plaintiff had no one to watch her children and had to miss three days of work until she made alternative arrangements.   Richter was upset that plaintiff missed three days at the end of the month, a time when she would typically work late.   Keller Dep., 151-53, 164.

In July 2001, plaintiff was disciplined for her use of vulgar language in the workplace.   Keller Dep., p. 223; Item 31, Exh. H.   In October 2001, plaintiff was advised that she had thirty days to enroll in accounting classes or her employment would be terminated.   Keller Dep., p. 246.   Plaintiff told Richter that she did not intend to take accounting courses, and was not interested in remaining with the company.   *Id.,* pp. 245-47, 249.   While plaintiff enjoyed accounts payable, she "didn't want to do high end accounting for a living."   *Id.,* p. 252.   Plaintiff's last day of work was December 3, 2001.   *Id.,* p. 255.   Plaintiff was told that she was not entitled to a severance package because her job was not being eliminated and she would be replaced.   *Id.,* p. 258.   Plaintiff never saw

a written policy regarding eligibility criteria for severance. *Id.,* p. 262. Her understanding was that employees who were laid off were given a severance package. *Id.,* p. 263. Plaintiff felt she was entitled to severance because her position was not filled and she had worked at Great Lakes for twelve years. *Id.,* p. 264. In an affidavit, Richter stated that he intended to replace plaintiff, but was instructed not to run an advertisement for the position because the company was expected to be sold and would not be hiring new employees (Item 32, ¶ 15).

## DISCUSSION

**1. Motion for Summary Judgment**

The standard of review on a motion for summary judgment is well established. Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The burden of establishing the absence of a genuine factual dispute rests on the party seeking summary judgment. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir. 1994). The movant may discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case on an issue on which the non-movant has the burden of proof. *See Celotex,* 477 U.S. at 323.

If the moving party meets its burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The function of a district court

in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried.  *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994).  In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir. 1991).  The nonmoving party may not rest upon unsubstantiated allegations, conclusory assertions, or mere denials, but must set forth and establish specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  A metaphysical or other whimsical doubt concerning a material fact does not establish a genuine issue requiring trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584 (1986).  If there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.  *Chambers,* 43 F.3d at 37.

## 2.  Title VII Claims

Plaintiff claims that her employment was terminated on the basis of her gender and her status as a pregnant woman.  Title VII of the Civil Rights Act of 1964 prohibits an employer from intentionally discriminating against an employee because of that employee's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  As amended by the Pregnancy Discrimination Act of 1978 ("PDA"), Title VII establishes that it is unlawful for an employer to discriminate against an individual "on the basis of pregnancy, childbirth or related medical conditions."  42 U.S.C. §§ 2000e-2(a)(1), 2000e(k).

6

The three-step burden-shifting analysis is applied to all Title VII claims of intentional discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Nagpal v. Harmon Associates*, 2005 WL 820523, *3 (E.D.N.Y. March 31, 2005). To establish a *prima facie* case of gender discrimination, the plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *See Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000), *cert. denied*, 540 U.S. 811 (2003). To establish a *prima facie* case of pregnancy discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by her position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995); *Sabatino v. Flik Int'l Corp.*, 286 F. Supp. 2d 327, 333 (S.D.N.Y. 2003). Alternatively, to satisfy the fourth prong, plaintiff may show the circumstances surrounding the discharge give rise to an inference of unlawful discrimination. *Quaratino,* 71 F.3d at 64.

If a plaintiff is able to establish a *prima facie* case, it creates a presumption of the employer's unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once the plaintiff establishes a *prima facie* case of discrimination, the defendant may rebut by producing evidence which, if taken as true by a jury, would allow the conclusion that there was a nondiscriminatory reason for the dismissal. *Weinstock v. Columbia Univ.*, 224 F.3d at 42; *Burdine*, 450 U.S. at 254. If the employer proffers such evidence of a nondiscriminatory motive for termination, the presumption of discrimination

raised by the *prima facie* case no longer applies. *Weinstock*, 224 F.3d at 42. The burden shifts back to the plaintiff who, to survive a motion for summary judgment, must offer evidence that suggests that the defendant's proffered reason is pretext for intentional discrimination. *McDonnell Douglas*, 411 U.S. at 803. The plaintiff's evidence must be sufficient to allow a jury to infer that the dismissal was actually motivated by discrimination. *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997), *cert. denied*, 525 U.S. 936 (1998). The Second Circuit has cautioned that because direct evidence of discriminatory intent is rare and state of mind is often at issue in discrimination cases, trial courts should be wary of granting summary judgment. *See, e.g., Holz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). However, a plaintiff must still "offer concrete evidence from which a reasonable juror could return a verdict in his favor." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988).

Here, plaintiff has failed to establish a *prima facie* case of pregnancy-related discrimination because she cannot establish that she was a member of a protected class at the time of the adverse employment action.[3]  Plaintiff's second child was born in June 1999. At the time of her discharge in December 2001, plaintiff had not been pregnant for over two years. As other courts have noted, pregnancy "differs from most other protected personal attributes in that it is not immutable. While some effects of pregnancy linger

---

[3]  Plaintiff points to incidents of alleged "discrimination" while she was pregnant, including comments by Richter and Surber regarding her commitment to her career and the fact that, during her maternity leave, a male intern was taken out to lunch by Richter and Surber, but the adverse employment action alleged in the complaint is her termination in December 2001. Plaintiff has failed to show that defendants took any adverse employment action against her during the period of her pregnancy.

beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions.'" *Solomen v. Redwood Advisory Co.*, 183 F. Supp. 2d 748, 753 (E.D.Pa. 2002)*; see also Sura v. Stearns Bank, N.A.,* 2002 WL 31898167, * 5 (D.Minn. December 18, 2002).   Generally, a woman's status as a new parent, standing alone, is insufficient to establish membership in the protected class for pregnancy discrimination.  *See Piantanida v. Wyman Ctr., Inc.*, 116 F.3d 340, 342 (8th Cir. 1997).   Rather, a woman who is not pregnant at or very near the time when an adverse employment action is taken against her "must demonstrate that the effects of her pregnancy continued to exist at the time she was [subject to the action], either in actual fact or in the thoughts and actions of those responsible . . . ." *Solomen*, 183 F. Supp. 2d at 754.  There is nothing in this record to suggest that, two years after giving birth, plaintiff was still affected by the pregnancy.  Her status as a working mother of two children is not enough to bring her into the protected class of pregnant workers under the PDA.  *See Fejes v. Gilpin Ventures, Inc.,* 960 F. Supp. 1487, 1491-92 (D. Colo. 1997) (child-rearing is not a medical condition within the scope of the PDA).  Accordingly, defendant's motion for summary judgment as to plaintiff's claim of pregnancy discrimination is granted, and the claim is dismissed.[4]

---

[4]  To the extent that plaintiff may be claiming that defendants created a hostile work environment during the period of her pregnancy, that claim must also fail.  Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation and citation omitted).  The court finds that the isolated statements to plaintiff regarding her commitment to family and career did not constitute intimidation, ridicule, or insult sufficiently severe and pervasive so as to alter the conditions of plaintiff's employment.

With respect to plaintiff's claim of gender discrimination, it is undisputed that she is a member of the protected class and that she suffered an adverse employment action. The parties dispute that plaintiff was qualified for the position.  Plaintiff states that she was hired as the "Assistant Controller," and so defendant must have been confident in her abilities.  Defendant states that as the position changed and more duties were added, it became clear that plaintiff did not have the accounting expertise to perform in the job effectively.  Plaintiff admits that she could not complete all the tasks required of her, yet argues that she was promised the guidance and training to perform effectively in the position.  The court need not address this factual dispute, as plaintiff has not sustained her burden of showing that her employment was unlawfully terminated based on her gender.  Even assuming that plaintiff has established a *prima facie* case of gender discrimination, defendant has proffered a legitimate, non-discriminatory reason for her discharge, and plaintiff has offered no proof to suggest that this reason is pretextual.

It is undisputed that after the company was acquired by GE Capital and the accounting and payroll departments were split, plaintiff was encouraged to improve her general accounting skills.  Plaintiff's position evolved, as new duties were added and different skills were required.  There is no question that defendant was within its rights to add duties and responsibilities to plaintiff's position, and demand further qualification for the job.  *Thornley v. Penton Publishing, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997) (absent evidence that its demands were made in bad faith, employer is not compelled to submit the reasonableness of its employment criteria to judge or jury); *Donaldson v. Merrill Lynch & Co., Inc.,* 794 F. Supp. 498, 504 n. 4 (S.D.N.Y. 1992) (the qualifications of a given position may change over time with the changing needs and goals of the employer's business,

10

making one who was "qualified" last year "unqualified" today).  As part of a "Performance Development Plan" in 2001, plaintiff was required to take accounting courses but did not do so.  In October 2001, plaintiff was advised that she had 30 days within which to enroll in accounting courses or face termination.  Plaintiff advised her supervisor that she had no intention of taking classes, "didn't want to do high end accounting for a living," and did not wish to remain with the company.  As a result, plaintiff's position was terminated.  Accordingly, defendants have offered a legitimate, non-discriminatory reason for the termination.

Plaintiff seeks to show that this reason for her discharge was pretextual by offering certain statements of Richter and Surber, and by the preferential treatment afforded a male temporary employee who performed some of plaintiff's duties while she was on maternity leave.  Specifically, plaintiff argues that she suffered gender discrimination at the time she announced her pregnancy when Richter and Surber began to question her commitment to her career and her availability for overtime.  Additionally, plaintiff argues that she received her first negative performance review when she was visibly pregnant, at the time that Richter and Surber imposed the increased responsibilities for her position.  Finally, plaintiff states that her replacement during her maternity leave, a young man, was taken out to lunch by Richter and Surber, whereas no women were taken out to lunch.

Verbal comments may constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff.  *See Schreiber v. Worldco, LLC.*, 324 F. Supp. 2d 512, 518-19 (S.D.N.Y. 2004).  However, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given

11

great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992), *cert. denied*, 510 U.S. 826 (1993). When determining whether a comment is a stray remark, courts consider (i) who made the remark, whether a decision-maker, supervisor, or co-worker; (ii) the point in time when the remark was made in relation to the employment decision at issue; (iii) whether a reasonable person could view the remark as discriminatory; and (iv) whether the remark was related to the decision-making process. *Sciola v. Quattro Piu, Inc.*, 361 F. Supp. 2d 61, 68 (E.D.N.Y. 2005) (citations omitted); *see also Santos v. Costco Wholesale, Inc.*, 271 F. Supp. 2d 565, 573 (S.D.N.Y. 2003).

Here, the record indicates that sometime in 1999, either before or after her maternity leave, Richard Surber asked plaintiff whether her career or family was more important. Keller Dep., p. 133. Plaintiff reported this conversation to Jerry Richter, who also asked plaintiff about her commitment to career and family. *Id.,* p. 134. On another occasion in 1999, when plaintiff had to leave work to pick up her children, Richter asked plaintiff whether her husband could get the children. *Id.,* p. 135.

While gender-based stereotyped remarks can be evidence that gender played a role in an adverse employment decision, *see Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107 (2d Cir. 2004), the isolated questions regarding plaintiff's commitment to her career and availability to work late were unrelated to the decision to discharge, occurred two years before plaintiff's termination, and were initiated primarily by Surber, who left defendant's employ before the decision was made to discharge plaintiff. The question by Richter, whether plaintiff's husband could pick up her children, was not unreasonable

12

and is not evidence of discrimination, as plaintiff's husband usually picked up their children from day care.   This case is distinguishable from *Back,* where repeated remarks by plaintiff's supervisors that plaintiff's position was not compatible with motherhood "drew a direct link between gender stereotypes and the conclusion that [plaintiff] should not be tenured . . . ."   *Id.,* at 125 n. 12.   In *Back,* evidence of such remarks was enough to raise an issue of fact regarding discriminatory motive.   Here, the isolated questions to plaintiff regarding her commitment to career were posed long before her termination, as was the question about plaintiff's husband's availability to pick up the children.   Neither Richter nor Surber expressed an opinion that plaintiff was unable to balance the demands of work and motherhood.   To the contrary, plaintiff testified that although her family was her first priority, she worked late when it was required.   It is well settled that stray remarks, with no nexus to the alleged adverse employment action, do not, without more, establish gender discrimination.   *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *Balut v. Loral Elec. Sys.*, 988 F. Supp. 339, 348-49 (S.D.N.Y. 1997), *aff'd,* 166 F.3d 1199 (2d Cir. 1998).

Additionally, even if true, the fact that a temporary male employee was taken out to lunch by plaintiff's superiors during plaintiff's maternity leave, over two years before the alleged discriminatory discharge, does not give rise to an inference of discrimination in the discharge itself.   Finally, plaintiff's first negative performance review, while she was visibly pregnant, occurred nearly three years prior to her discharge and was the result of increased duties and responsibilities related to her new position.   There is no evidence to indicate that this negative review was related to plaintiff's pregnancy.

It is undisputed that defendant wanted plaintiff to take college-level accounting courses and develop expertise in accounting.  While plaintiff may have initially believed that additional accounting training was to be provided in-house, she was later aware that outside courses were required.  Keller Dep., at pp. 244-45.  It is also undisputed that plaintiff had no interest in taking such courses, did not want to remain with the company, and "didn't want to do high end accounting for a living" (*Id.,* at pp. 247, 252).  When defendant gave plaintiff the choice of taking accounting classes or being discharged, plaintiff chose to be discharged.  Plaintiff admitted that she wished to leave her position, but felt she was entitled to a severance package.  There is nothing to suggest that her termination occurred for any reason other than the fact that plaintiff chose not to develop her accounting skills.  Accordingly, defendant's motion for summary judgment is granted, and the Title VII claims are dismissed.

## 3.  ERISA Claim

Plaintiff claims that she was entitled to severance pay as part of an employee benefit plan under ERISA.  Defendant argues that plaintiff has failed to establish the existence of any legally enforceable promise that might give rise to a severance right under ERISA.

ERISA defines an "employee welfare benefit plan" as

any plan, fund, or program . . . established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) . . . benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits . . . or (B) any benefit described in section 186(c) of this title . . . .

14

29 U.S.C.A. § 1002.  It is well established that a program to pay severance may constitute an employee welfare plan warranting ERISA protection, *see Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 565 (2d Cir.), *cert. denied*, 525 U.S. 963 (1998), and that such a "plan, fund, or program" under ERISA need not be embodied in a written, formal document. *Feifer v. Prudential Ins. Co. of America*, 306 F.3d 1202, 1209 (2d Cir. 2002) (citing *Grimo v. Blue Cross /Blue Shield*, 34 F.3d 148, 151 (2d Cir. 1994)).  In this case, it is undisputed that defendant did not have a written severance plan, but provided severance packages to certain terminated employees.

Because only "plans" involve administrative activity potentially subject to employer abuse, the touchstone for ERISA application is the existence of an undertaking or obligation by an employer that requires the creation of an ongoing administrative program. *See Hijeck v. United Technologies Corp.*, 24 F. Supp. 2d 243, 247 (D.Conn. 1998) (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987)).  While the Second Circuit has not decided which factors should be determinative in every case,

> [it] ha[s] found that an ongoing administrative program may exist (1) where an employer's undertaking requires managerial discretion, that is, where the undertaking could not be fulfilled without ongoing, particularized, administrative analysis of each case . . .; (2) where a reasonable employee would perceive an ongoing commitment by the employer to provide some employee benefits; and (3) where the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria.

*Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 737 (2d Cir. 2001) (citations and quotations omitted); *see also James v. Fleet/ Norstar Fin. Group, Inc.*, 992 F.2d 463, 468 (2d Cir. 1993) (stating that a severance policy must bear the hallmarks of

managerial discretion and ongoing administration in order to qualify for ERISA protection as a covered "plan").

Courts have held that one-time, lump-sum payments or payments made over a short period of time do not satisfy the requirement of an "administrative scheme" because such payments do not make periodic demands on an employer's assets that create the need for financial coordination and control. See James, 992 F.2d at 464, 466; Tischmann, 882 F. Supp. 1358, 1369 (S.D.N.Y. 1995) (finding that a severance plan that "envisions payments pursuant to a 'regular payroll schedule,' or, if [the employer] chooses, in a 'discounted lump sum,'" does not implicate ongoing administrative scheme).

Similarly, ERISA protection does not extend to plans that require an employer to make only "[s]imple arithmetic calculations and clerical determination[s]" in order to decide the amount of severance payments, see Fort Halifax, 482 U.S. at 12, even where "[e]mployees had different termination dates and different eligibility for receiving the payment; the payments had to be calculated individually and deductions for social security taxes, health and medical benefits, and 401k plans had to be made," because this determination is not sufficiently ongoing, particularized, and discretionary. Cardone v. Empire Blue Cross and Blue Shield, 884 F. Supp. 838, 846 (S.D.N.Y. 1995).

Here, plaintiff has not established that there are genuine issues of material fact regarding whether defendant's payment of severance in certain instances constitutes an ERISA-covered plan.  Plaintiff asserts that employees who were laid off received severance packages.  She argues that she was entitled to severance because she was not replaced and had twelve years of service with the company.  In order to survive summary judgment, plaintiff must provide some evidentiary basis, beyond conjecture, for establishing

16

the existence of an ERISA plan, not just occasional payments of severance benefits on a case-by-case basis.  *See Ferrand v. Credit Lyonnais,* 2003 WL 22251313, at *15 (S.D.N.Y. September 30, 2003), *aff'd*, 110 Fed. Appx. 160 (2d Cir. 2004).  Specifically, plaintiff has not demonstrated that defendant's policy of providing severance to certain outgoing employees called for managerial discretion or the establishment of new administrative schemes to disburse severance benefits.  *See Hayles v. Advanced Travel Mgmt. Corp.,* 2004 WL 26548, at *8 (S.D.N.Y. January 5, 2004).  More importantly, plaintiff has not alleged or produced any evidence showing that the alleged severance plan required defendant to set up an administrative scheme to pay it out over time or that there were certain criteria an employee must meet to qualify for severance.  *Id.*  Where the only evidence presented is that in individual cases severance has been awarded, without demonstrating what these benefits consisted of, how such benefits were calculated, or how such benefits were administered, there is no evidence that such benefits were administered through a benefit plan to allow such a claim to proceed to trial. *See Dennis v. RSL COM U.S.A., Inc.*,  1998 WL 409720, at *4 (S.D.N.Y. July 21, 1998).  Plaintiff has failed to raise an issue of fact, and her ERISA claim must be dismissed.

**4.  Implied Contract Claim**

Finally, plaintiff contends that the defendant's obligation to provide severance pay arose out of an implied contract.  An implied contractual relationship may be established by conduct of the parties as well as by express agreement.  *See Dooner v. Keefe, Bruyette & Woods, Inc.*, 157  F. Supp. 2d 265, 286 (S.D.N.Y.  2001) (citing *Mirchel v. RMJ Sec. Corp.,* 613 N.Y.S.2d 876, 878 (App. Div. 1994)).  "An implied-in-fact contract 'requires such

17

elements as consideration, mutual assent, legal capacity and legal subject matter.'" *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 376 n. 5 (2d Cir. 2000) (quoting *Maas v. Cornell Univ.*, 721 N.E.2d 966, 970  (N.Y. 1999)).

In this case, plaintiff alleges that defendant "adopted a severance pay plan for all eligible employees . . ." and states that she was an eligible employee who "satisfactorily performed all required employment obligations and duties . . ." (Item 14, ¶¶ 56-58).  There is no allegation in the amended complaint or on the record, however, of any conduct by defendant that indicates satisfaction of the requisite elements for an implied-in-fact contract for severance, including consideration and mutual assent.

Contrary to plaintiff's assertion, the record indicates that the parties understood that plaintiff was not entitled to severance.  Defendant expressly advised plaintiff that she was not entitled to severance as her position was not being eliminated in a reduction in force. Keller Dep., pp. 258.  Plaintiff states that laid-off employees were offered severance pay, but concedes that she was not laid off.  *Id.,* p. 259.   Plaintiff acknowledges that an employee who quit was not entitled to severance pay.  *Id.,* p. 262.  While certain laid-off employees were offered severance packages upon their termination, plaintiff does not allege that defendant promised severance payments specifically to her, or to any employee in similar circumstances.  This undercuts a finding of mutual assent to severance payments. *See Hayles,* 2004 WL 26548, at *10.  Accordingly, the court finds that there are no genuine issues of material fact as to whether there was an implied-in-fact contract for severance benefits, and summary judgment is granted in favor of defendants on plaintiff's implied-contract claim.  *Id.*

18

## **CONCLUSION**

Defendant's motion for summary judgment is granted, and the complaint is dismissed.  Judgment shall enter for defendant.

So ordered.

_____\s\ John T. Curtin_____
JOHN T. CURTIN
United States District Judge

Dated:  September   28   , 2005
p:\opinions\02-719.sep2205